ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| JACOB HUCK, ANNETTE BLASINI BATISTA, MICHELLE ISABEL DÍAZ BELTRÁN, DANIEL SHIELDS, ANNA MARTÍN, KATHLEEN ENGSTROM Y GREGORY ENGSTROM<br><br>Apelantes<br><br>V.<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO, AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN, OFICINA DE GERENCIA Y PERMISOS, DEPARTAMENTO DE RECURSOS NATURALES Y AMBIENTALES, JUNTA DE PLANIFICACIÓN, MUNICIPIO DE RINCÓN, ALEXANDRA VELÁZQUEZ DELGADO Y CLAUDIO TORRES SERRANO<br><br>Apelados | TA2025AP00409 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Aguadilla<br><br>Caso Núm.: AU2025CV00191<br><br>Sobre: *Injunction* |

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Rivera Torres y el Juez Marrero Guerrero.

Marrero Guerrero, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 27 de marzo de 2026.

Las señoras Annette Blasini, Michelle Díaz Beltrán, Kathleen Engstrom y Anna Martín, así como los señores Jacob Huck, Daniel Shields y Gregory Engstrom (en conjunto, apelantes) solicitaron la revisión de una *Sentencia* emitida y notificada el 8 de mayo de 2025 por el Tribunal de Primera Instancia, Sala Superior de Aguadilla (TPI).[1] En el aludido dictamen, el foro primario declaró Ha Lugar las solicitudes de desestimación que presentaron el Municipio de Rincón (Municipio), el Departamento de Recursos Naturales y Ambientales (DRNA), la Oficina de Gerencia de Permisos (OGPe), la Autoridad de Carreteras y Transportación (ACT) y la ingeniera Alexandra Velázquez Delgado (en conjunto, apelados) respecto a la *Demanda* instada por

---

[1] Entrada Núm. 142 del caso AU2025CV00191 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).

los apelantes en la que solicitaron la paralización mediante interdicto, por construcción ilegal, y la revocación del permiso para viabilizar la construcción de proyecto de ruta ciclista en el Municipio de Rincón. Ello, al concluir que los apelantes no probaron hechos que justificaran la concesión de un remedio al amparo del Artículo 14.1 de la *Ley para la Reforma del Proceso de Permisos de Puerto Rico*, Ley Núm. 161-2009, según enmendada, 23 LPRA sec. 9024 (*Ley de Permisos*).

Con el beneficio de la regrabación de la prueba oral y la comparecencia de las partes, se adelanta la revocación del dictamen apelado.

**I.**

Este caso se originó el 4 de abril de 2025, cuando los apelantes, como propietarios y miembros de la comunidad, presentaron una *Demanda* en la que solicitaron un interdicto al amparo de la *Ley de Permisos, supra,* contra el Municipio, el DRNA, la ACT, la OGPe, la Junta de Planificación (JP) y los ingenieros Velázquez Delgado y Claudio Torres Serrano.[2] Alegaron que el proyecto *Ruta Escénica para Ciclistas y Peatones* de Rincón se autorizó en violación al debido proceso de ley y múltiples estatutos. Sostuvieron que la OGPe concedió el Permiso Único Incidental Operacional 2024-544025-PUI-300201 (PUI) mediante el mecanismo de exclusión categórica, sin notificar ni celebrar vistas públicas. Adujeron que dicha actuación les privó de su derecho a participar en decisiones que incidían en la conservación de los recursos naturales y sus derechos propietarios.

Señalaron que la ACT sometió información incorrecta, obsoleta o engañosa para eludir la evaluación ambiental y participación ciudadana. Destacaron que se utilizó un deslinde de la zona marítimo terrestre con más de diecisiete (17) años de antigüedad y una

---

[2] *Íd.*, Entrada Núm. 1.

Declaración de Impacto Ambiental correspondiente a una obra distinta de paseo tablado, pese a que el proyecto conllevaba pavimentación, excavación en la arena y tala de cerca de doscientos (200) árboles.

Arguyeron que la OGPe otorgó el permiso sin evaluación; el DRNA endosó el proyecto de forma *ultra vires*; la JP se abstuvo de ejercer sus facultades interventoras, y el Municipio endosó el proyecto sin notificación ni vistas públicas. Expusieron que el proyecto invadía bienes de dominio público y áreas ecológicamente sensitivas, incluyendo la zona marítimo terrestre y la Reserva Marina Tres Palmas. Adujeron que, además, afectaba corales protegidos, áreas de anidaje de tortugas, humedales y recursos arqueológicos, y causaba un daño irreparable a sus vidas, seguridad, tranquilidad y propiedades. Por ello, solicitaron la paralización inmediata de las obras y la revocación del permiso, entre otros.

Posteriormente, el 14 de abril de 2025, el Municipio solicitó la desestimación de la causa de acción en su contra.[3] Sostuvo que su endoso al proyecto no lo convertía en parte indispensable bajo el Artículo 14.1 de la *Ley de Permisos*, *supra*, sec. 9024. Añadió que no emitió la determinación final ni fue el dueño, ingeniero o arquitecto del proyecto. A su vez, planteó que la *Demanda* adolecía de justiciabilidad por basarse en daños hipotéticos y generalizados.

Ese mismo día, los apelantes se opusieron y argumentaron que el Municipio participó directamente en las actuaciones cuestionadas.[4] Ello, al endosar el proyecto sin vistas públicas ni notificación a los afectados, en violación del debido proceso de ley y del deber de proteger los recursos naturales y las especies dentro de su jurisdicción. Además, alegaron que este reconoció públicamente la obra como suya, divulgó información, invitó al público a acudir a

---

[3] *Íd.*, Entrada Núm. 42.
[4] *Íd.*, Entradas Núm. 45 y 49.

sus oficinas para obtener detalles e incluyó enlaces de páginas oficiales del proyecto que difundían datos del contratista TAMRIO.

Al siguiente día, el DRNA presentó su *Moción de Desestimación.*[5] Planteó que las alegaciones en su contra excedían el alcance del Artículo 14.1 de la *Ley de Permisos, supra,* sec. 9024, al buscar impugnar la constitucionalidad del Inciso I(6) de la Orden Administrativa 2021-02[6] sobre exclusiones categóricas y revocar un endoso no identificado. Por otro lado, precisó que los endosos no equivalían a permisos ni autorizaciones finales y no facultaban, por sí solos, la ejecución de obras, al tratarse únicamente de documentos de apoyo. Además, explicó que no administraba leyes o reglamentos de planificación ni emitió el permiso impugnado.

Simultáneamente, la ACT peticionó la desestimación de la *Demanda* al alegar que los apelantes no emplazaron personal y oportunamente al ingeniero Torres Serrano, quien era parte indispensable.[7] El mismo día, los apelantes sostuvieron que la ACT intentó beneficiarse de las dilaciones provocadas por sus funcionarios, quienes evadieron ser emplazados.[8]

Acto seguido, la JP solicitó la desestimación de la *Demanda* al aducir que debía ceñirse a los contornos estrictos de los Artículos 14.1 y 9.10 de la *Ley de Permisos, supra,* secs. 9024 y 9019i.[9] Destacó que el proyecto contaba con un PUI válido, el cual creó una presunción de corrección y legalidad, sin que se alegara fraude, dolo, engaño o ilegalidad que justificara su revocación. Sostuvo que los apelantes se apoyaron en especulaciones e interpretaciones erróneas.

Al día siguiente, el Municipio presentó una réplica en la que planteó que los apelantes procuraban la revocación de su endoso,

---

[5] *Íd.*, Entrada Núm. 61.
[6] Dicha Orden Administrativa se derogó mediante la Orden Administrativa 2025-10 del DRNA, sin embargo, es la aplicable a los hechos de este caso.
[7] *Íd.*, Entradas Núm. 63 y 65.
[8] *Íd.*, Entrada Núm. 76.
[9] *Íd.*, Entrada Núm. 78.

remedio que no estaba contemplado en la *Ley de Permisos, supra.*[10] Expuso que al tratarse de un acto discrecional, la intervención judicial violaría la doctrina de separación de poderes. A esto, los apelantes respondieron que el carácter discrecional del endoso no eximía al Municipio del escrutinio judicial por abuso de discreción.[11] Reiteraron que este promovió activamente el proyecto y destinó recursos municipales en beneficio del contratista. Estos cuestionaron la legitimidad de los endosos y solicitaron la divulgación de los documentos relacionados con el deslinde en el área del balneario que coincidía con el proyecto.

El 21 de abril de 2025, los apelantes se opusieron a las solicitudes de desestimación de la JP y del DRNA.[12] Alegaron que la JP era parte indispensable por su participación activa en los cambios al diseño original del proyecto, al proponer su desarrollo dentro de la zona marítimo terrestre, sin notificación ni vistas públicas. Afirmaron que la agencia no intervino ante el uso de un deslinde obsoleto y el impacto ambiental y arqueológico del proyecto, circunstancias incompatibles con el mecanismo de exclusión categórica.

En cuanto al DRNA, aseveraron que el endoso fue *ultra vires* y constituía un abuso de discreción al no requerir un deslinde actualizado de la zona marítimo terrestre, apoyándose en uno elaborado en el 1998 y aprobado en el 1999 y en una Declaración de Impacto Ambiental del 2003 que correspondía a otro proyecto. Ello, a pesar de que se requería un deslinde vigente y celebrar vistas públicas para proyectos de alto interés público. Adujeron que el DRNA incumplió con su deber de proteger la Reserva Marina Tres Palmas y las especies en peligro de extinción. Asimismo, arguyeron

---

[10] *Íd.*, Entrada Núm. 88.
[11] *Íd.*, Entrada Núm. 95.
[12] *Íd.*, Entradas Núm. 93 y 94.

que la Orden Administrativa 2021-02, *supra,* era inconstitucional por permitir las exclusiones categóricas sin vistas públicas.

El mismo día, el DRNA replicó que los reclamos en su contra se limitaban a la revocación de un endoso por abuso de discreción, asunto que no procedía mediante el trámite sumario.[13] Añadió que no era responsable de la expedición del PUI ni de la evaluación de la Declaración de Impacto Ambiental, ya que eran funciones de la OGPe.

En igual fecha, el ingeniero Torres Serrano solicitó la desestimación de la *Demanda* al alegar que no era parte indispensable al no emitir la determinación final ni certificar o someter planos ante la OGPe para obtener el permiso.[14] Indicó que se alegó que firmó un memorial explicativo bajo el mecanismo de exclusión categórica, sin que se identificara información incorrecta o engañosa alguna. Señaló que no preparó ni selló los planos relativos a los límites de la zona marítimo terrestre, ni intervino en la exclusión categórica gestionada por la ACT antes de su contratación.

El 23 de abril de 2025, los apelantes adujeron que el ingeniero Torres Serrano figuraba en el *Single Business Portal* (SBP) como contacto, gerente de proyectos y solicitante del permiso.[15] Asimismo, apuntaron que el hecho de que firmó y sometió el memorial explicativo ante la OGPe por vía de exclusión categórica, documento esencial para tramitar el proyecto bajo la Orden Administrativa 2021-02, *supra,* no lo exoneró de responsabilidad. Además, subrayaron que sometió el formulario *Notice of Intent* (NOI) ante la Agencia de Protección Ambiental (EPA), en el que reconoció la existencia de escorrentías de aguas y de especies en peligro de extinción.

Ese día, el ingeniero Torres Serrano presentó una moción aclaratoria en la que sostuvo que los apelantes lo vincularon al

---

[13] *Íd.,* Entrada Núm. 99.
[14] *Íd.,* Entrada Núm. 101.
[15] *Íd.,* Entrada Núm. 108.

proceso de exclusión categórica por firmar el memorial explicativo, pero que la Determinación de Cumplimiento Ambiental por Exclusión Categórica se emitió previo a su intervención.[16] Señaló que el memorial explicativo no contenía información falsa, fraudulenta ni engañosa, y se limitaba a describir la forma en que se ejecutarían los trabajos previamente autorizados.

El 24 de abril de 2025, la ACT solicitó la desestimación al alegar que la pérdida de privacidad, aumento de tráfico, ruidos y riesgos, falta de notificación y obstrucción de acceso a sus propiedades o a la playa no constituían un interés público diferenciado.[17] Adujo que al tratarse de una obra pública, prevalecía el interés general. En oposición, los apelantes esgrimieron que eran colindantes y miembros de la comunidad directamente impactados.[18] A su vez, arguyeron que el permiso autorizó, mediante exclusión categórica, un proyecto que excedía los 250,000 pies cuadrados, pese a que el mecanismo se limitaba a 15,000 pies cuadrados. Indicaron que el proyecto implicó un impacto ambiental significativo y requirió un nuevo deslinde. Añadieron que, aunque la JP autorizó el proyecto mediante una consulta de ubicación, lo aprobado era distinto.

Más tarde, la ingeniera Velázquez Delgado solicitó la desestimación de la *Demanda* al alegar que las alegaciones en su contra de radicar el PUI y someter información incorrecta u obsoleta eran genéricas y conclusivas y excedían el alcance del Artículo 14.1 de la *Ley de Permisos, supra,* sec. 9024.[19] Añadió que una certificación profesional o permiso otorgado válidamente gozaba de una presunción de corrección y legalidad que no se rebatió.

Posteriormente, la OGPe solicitó la desestimación de la *Demanda* al sostener que los apelantes no demostraron un interés

---

[16] *Íd.,* Entrada Núm. 117.
[17] *Íd.,* Entrada Núm. 119.
[18] *Íd.,* Entrada Núm. 125.
[19] *Íd.,* Entrada Núm. 123.

propietario o personal adversamente afectado por el PUI.[20] Señaló que las alegaciones se referían a impactos de construcción y determinaciones de otras agencias, asuntos ajenos a lo autorizado mediante el PUI. Señaló que el Artículo 9.10 de la *Ley de Permisos*, *supra*, sec. 9019i, establecía una presunción de legalidad de un permiso y que su revocación solo procedía ante alegaciones de fraude, dolo o engaño, inexistentes en la *Demanda*. Añadió que el PUI no requería un plano de deslinde, puesto que no autorizó la construcción de la obra, sino medidas incidentales. Además, arguyó que no se evidenció que el proyecto se ubicaba en bienes de dominio público.

El 25 de abril de 2025, el TPI celebró una vista de interdicto preliminar y permanente, en la que se resolvieron las solicitudes de desestimación y se presentaron los testimonios de la señora María Isabel Oliveras y de los señores Pedro Manuel Cardona Roig y Jacob Huck, que se sintetizan a continuación:

**María Isabel Oliveras[21]**

La testigo declaró que era asistente administrativo en la oficina del senador Eliezer Molina desde enero de 2025. Atestó que recibió y analizó unos documentos que la ACT le remitió a una Comisión del Senado. Señaló que identificó varias incongruencias, entre ellas que faltaban doce (12) páginas en el documento de deslinde que comprendían áreas que colindaban con la zona marítimo terrestre y el balneario de Rincón, y que en el plano de pavimentación tampoco se incluía el segmento correspondiente a esas páginas.

Declaró que el endoso del US Fish and Wildlife Service estaba condicionado a que el proyecto no afectara la vida marina ni los anidajes de tortugas. Sin embargo, indicó que la entidad sin fines de lucro Tortugueras documentó anidajes entre 2016 y 2024 en varias

---

[20] *Íd.*, Entrada Núm. 132.
[21] Regrabación del 25 de abril de 2025.

playas de Rincón, incluyendo Playa Domes, Playa Trampa, Playa María, el Balneario de Rincón y la Reserva Tres Palmas.

Atestiguó que el endoso del Instituto de Cultura disponía que si se encontraban bienes arqueológicos, el proyecto debía rediseñarse. Expresó que encontró que en el barrio Ensenada, en el área conocida como El Yucayeque, existían hallazgos arqueológicos, incluyendo una laja de piedra con petroglifos en el área faltante en el documento del deslinde y en el plano de pavimentación.

**Pedro Cardona Roig[22]**

El testigo indicó que era arquitecto y planificador. Relató que trabajó en la JP, donde ocupó el cargo de vicepresidente hasta 2016. Expresó que participó en la elaboración de diversos instrumentos de planificación, incluyendo el Plan de Uso de Terrenos de Puerto Rico, el Plan del Carso, el Plan Territorial de Rincón, el Reglamento Conjunto de 2015, entre otros.

El testigo manifestó que analizó los documentos relacionados con el caso, incluyendo el permiso de construcción y el PUI. Declaró que comparó el PUI contenido en el expediente con la información disponible en el SBP. Precisó que no encontró una Declaración de Impacto Ambiental ni un memorial explicativo. Añadió que el expediente presentó problemas de organización e identificación, ya que varios documentos carecían de fecha, título claro o identificación adecuada, lo que le dificultó determinar la información que las agencias evaluaron y la base de sus determinaciones.

El perito indicó que observó discrepancias entre el documento físico del PUI y la información reflejada en el SBP. Indicó que en el portal se mencionó solo una parcela afectada y un solo propietario, cuando en realidad el proyecto impactaba múltiples parcelas y propietarios, más de cien (100), según los planos de adquisición.

---

[22] Regrabación del 25 de abril de 2025.

También, señaló que el portal indicaba que el proyecto no afectaba zonas susceptibles a inundación por marejadas ni áreas de causa mayor, lo cual no era correcto, ya que parte del proyecto discurría por zonas susceptibles a marejadas, áreas de hábitat y otras áreas ambientalmente sensibles. A su juicio, estas condiciones impedían que el proyecto se tramitara mediante una exclusión categórica, ya que la Orden Administrativa 2021-02 del DRNA, *supra*, prohibía ese mecanismo en tales características ambientales.

Planteó que el único deslinde que identificó en el expediente fue uno del año 1998, aunque se mencionó uno de 2007, el cual no aparecía en los registros del DRNA. Explicó que, conforme al Reglamento Conjunto, *supra*, un deslinde tenía una vigencia de cinco (5) años o debía revisarse si ocurría un evento natural significativo que alterara la costa. Por ello, subrayó que para un permiso solicitado en 2024, sería razonable contar con un deslinde reciente, al menos alrededor de 2019, para considerarlo vigente.

Añadió que la costa de Rincón era dinámica y sufrió erosión costera, documentada en estudios y que eventos como los huracanes Irma y María pudieron alterar sustancialmente las condiciones costeras desde el deslinde de 1998.

El perito también explicó que el deslinde delimitaba los bienes de dominio público marítimo terrestre, identificando hasta dónde llegaban estos bienes mediante el análisis de elementos bióticos y abióticos. Indicó que estas áreas eran propiedad del pueblo de Puerto Rico bajo la custodia del DRNA, por lo que existían restricciones para proyectos de construcción.

Asimismo, mencionó que el expediente presentaba deficiencias de documentación, incluyendo documentos sin identificación clara, memoriales incompletos y ausencia de información clave, lo cual podría haber llevado a que agencias emitieran comentarios sin contar con información completa. En particular, expresó preocupación de

que no se haya considerado adecuadamente el yacimiento arqueológico en el Bosque de Yucayeque.

Al analizar los planos de pavimentación, el perito estimó que el proyecto implicó una superficie de construcción mayor que el límite permitido para una exclusión categórica (15,000 pies cuadrados). Indicó que el proyecto podría alcanzar alrededor de 250,000 pies cuadrados. Además, expresó que incluía carril de bicicleta, estacionamientos, plazas, intersecciones, iluminación, relocalización de infraestructura de acueductos y electricidad y mitigación ambiental, lo que representaba un proyecto de impacto significativo como si fuera una carretera en vez de una simple ruta ciclista.

El perito reconoció que no tuvo acceso a una copia certificada del PUI ni al expediente completo de la OGPe, y que sus opiniones se basaron únicamente en los documentos que los apelantes le proveyeron y un enlace con documentos del expediente de la ACT. Explicó que el PUI era un permiso incidental relacionado con el permiso de construcción, y que ciertos endosos de las agencias y documentos como el deslinde solían estar vinculados al permiso de construcción. También señaló que sería importante revisar el expediente de la JP por tratarse de un proyecto que surgió de una consulta de ubicación, y sostuvo que la responsabilidad de mantener un expediente completo correspondía al proponente, la ACT. Finalmente, indicó que aunque existía una exclusión categórica federal, las disposiciones ambientales del DRNA debían considerarse.

**Jacob Huck[23]**

El testigo declaró que vivía en el área del Paseo Velázquez. Manifestó que preparó imágenes y fotomontajes en los que superpuso planos del proyecto sobre fotografías aéreas utilizando el programa paint.net. Indicó que las fotografías fueron tomadas por un tercero,

---

[23] Regrabación del 25 de abril de 2025.

Rich Ross-Massler, y que él las había alineado con los planos utilizando referencias visibles como carreteras, verjas y otros elementos del terreno. Según explicó, esas imágenes se presentaron para ilustrar su alegación de que el trazado del paseo proyectado entraba en la zona marítimo terrestre. Además, presentó fotografías tomadas por él y por su esposa desde su residencia para demostrar el antes y después de los trabajos realizados en el área, particularmente la tala de árboles. También, afirmó que no recibió notificación previa sobre la tala de árboles ni sobre los trabajos relacionados con el proyecto.

Asimismo, testificó que descargó la versión electrónica del formulario de solicitud del permiso desde el portal de OGPe. Añadió a ese material una página del Reglamento Conjunto y otra relacionada con siembra y mitigación de árboles, y realizó anotaciones propias porque, a su juicio, varias de las contestaciones contenidas en el formulario no eran correctas. Indicó que el proyecto impactaría un área estimada en 12,000 metros cuadrados, y que en ese cálculo no se consideraron elementos como drenajes, excavaciones, cunetas o áreas de estacionamiento.

También, expresó preocupación sobre otros aspectos del formulario, señalando que las respuestas indicaban que no habría corte de árboles, no se excedería el volumen de tierra o material removido y no habría estacionamiento, lo cual no reflejaba lo que había observado en el área. Igualmente, cuestionó que se identificara arena de playa como material a extraerse y señaló que el formulario indicaba que no aplicaban fondos federales, aunque otra parte del documento reflejaba lo contrario. En relación con la mitigación por tala de árboles, indicó que el documento parecía utilizar una versión antigua del Reglamento Conjunto, mencionando una proporción mínima de tres (3) árboles sembrados por cada árbol cortado, cuando el número de árboles a reponer debía ser mayor al indicado.

El testigo reconoció que el documento que presentó reflejaba una modificación del 2 de noviembre de 2024 y que él obtuvo la información a través del portal del SBP de la OGPe. Manifestó que observó el expediente, el cual contenía información adicional a la que él había revisado. También, sostuvo que el documento presentado correspondía al PUI, ya que aparecía al realizar la búsqueda en el portal mediante el número del permiso. Indicó que, en gran medida, el PUI reflejaba la información contenida en la versión web. No obstante, señaló que el documento no incluía toda la información, como la identificación de los catastros o colindantes.

Tras los apelantes concluir con la presentación de la prueba, el 2 de mayo de 2025, el Municipio, el DRNA, la OGPe, la ACT y la ingeniera Velázquez Delgado solicitaron la desestimación al amparo de la Regla 39.2(c) de Procedimiento Civil, 32 LPRA Ap. V, R. 39.2(c).[24] En esencia, sostuvieron que la prueba presentada no establecía los elementos requeridos para la acción, particularmente que el PUI se emitió a base de información falsa, incorrecta o fraudulenta. Argumentaron que ninguno de los testigos presentó evidencia directa que identificara qué información específica estaba incorrecta ni que la misma indujo a las agencias a emitir el permiso.

Por su parte, los apelantes se opusieron a la desestimación y sostuvieron que la prueba presentada demostraba inconsistencias y deficiencias en los documentos relacionados con el proyecto, incluyendo la ausencia de ciertos documentos, discrepancias en la información contenida en el expediente y en la plataforma electrónica, y la utilización de un deslinde antiguo que no reflejaba las condiciones actuales de la costa. Plantearon que, aunque el PUI no exigía un deslinde como requisito, derivaba de un permiso de construcción que requería un deslinde. Asimismo, argumentaron que

---

[24] Regrabación del 2 de mayo de 2025.

dichas irregularidades evidenciaron problemas en el proceso de evaluación del permiso y en la información utilizada por las agencias.

Luego de escuchar los argumentos de las partes, el foro primario declaró Con Lugar las mociones de desestimación, desestimó la *Demanda* por insuficiencia de la prueba y dejó sin efecto la orden de paralización que estaba vigente hasta ese momento.

El 8 de mayo de 2025, el TPI emitió y notificó una *Sentencia*, mediante la cual desestimó la *Demanda* al amparo del Artículo 14.1 de la *Ley de Permisos, supra*, sec. 9024, al concluir que los apelantes no acreditaron los elementos necesarios para obtener los remedios solicitados.[25] Indicó que el Artículo 9.10 de la *Ley de Permisos, supra*, sec. 9019i, establecía una presunción de corrección y legalidad de las determinaciones finales y permisos expedidos por la OGPe, los municipios y los profesionales autorizados, la cual solo podía derrotarse mediante prueba de fraude, dolo, engaño y otra conducta ilegal o cuando la estructura representara un riesgo a la salud, seguridad o condiciones ambientales o arqueológicas.

Además, puntualizó que el Artículo 14.1 de la *Ley de Permisos, supra*, sec. 9024, permitía solicitar la revocación de una determinación final otorgada con información incorrecta o falsa, así como la paralización de obras sin permisos. Señaló que una Determinación de Cumplimiento Ambiental por Exclusión Categórica constituía una determinación final y que las exclusiones categóricas aplicaban únicamente a acciones rutinarias sin impacto ambiental significativo, conforme la Orden Administrativa 2021-02, *supra*.

No obstante, determinó que los apelantes no presentaron evidencia del PUI ni los endosos cuya revocación interesaban, ni demostraron que la ACT suministró información incorrecta o falsa a la OGPe, al DRNA o al Municipio. Enfatizó que no bastaba con alegar

---

[25] *Íd.,* Entrada Núm. 142.

que el expediente administrativo estaba incompleto, sino probar que la información utilizada para obtener la determinación final era falsa o incorrecta. Concluyó que no se acreditó, mediante un agrimensor que el deslinde utilizado del 1998 reflejara una realidad distinta al área donde se estaba desarrollando el proyecto ni que el memorial explicativo o las solicitudes sometidas contuvieran información falsa o engañosa. En consecuencia, declaró Ha Lugar las solicitudes de desestimación presentadas por los apelados.

Inconforme, el 23 de mayo de 2025, los apelantes solicitaron la reconsideración de la *Sentencia* y enmienda de las determinaciones de hechos y conclusiones de derecho.[26] Los apelados presentaron sus respectivas oposiciones y, mediante *Resolución Interlocutoria* emitida el 24 de septiembre de 2025, el TPI denegó la reconsideración.[27]

Aún insatisfechos, el 6 de octubre de 2025, los apelantes presentaron este recurso, en el que plantearon que el TPI incidió en cometer los siguientes errores:

A. EL TPI ERRÓ Y/O ABUSÓ DE DISCRECIÓN AL APLICAR LAS REGLAS DE EVIDENCIA SELECTIVA E INCONSISTENTEMENTE.

B. EL TPI ERRÓ Y/O ABUSÓ DE DISCRECIÓN AL NO ARMONIZAR TODAS LAS DISPOSICIONES CONSTITUCIONALES, ESTATUTARIAS Y REGLAMENTARIAS INVOLUCRADAS PARA UNA SOLUCIÓN JUSTA DE LA CONTROVERSIA Y LOGRAR UN RESULTADO SENSATO, LÓGICO Y RAZONABLE.

C. EL TPI ERRÓ Y/O ABUSÓ DE SU DISCRECIÓN AL IMPONER HONORARIOS SIN FUNDAMENTO EN [EL] ART. 14 DE LA LEY 161-2009.

D. EL TPI ERRÓ Y/O ABUSÓ DE SU DISCRECIÓN EN VIOLACIÓN AL DEBIDO PROCESO DE LEY CONSTITUCIONAL DE LOS APELANTES.

En esencia, los apelantes sostuvieron que el TPI erró al descartar su prueba y exigir la incorporación en evidencia del PUI, los endosos del DRNA y el Municipio y el memorial explicativo, pese a las

---

[26] *Íd.*, Entrada Núm. 161.
[27] *Íd.*, Entrada Núm. 222.

admisiones sobre su existencia y autoría. Indicaron que, ante la falta de transparencia y el inicio del proyecto, incluida la tala de árboles en la propiedad del señor Huck, radicaron la *Demanda* para evitar su academicidad. Alegaron que las Reglas de Evidencia, 32 LPRA Ap. VI, se aplicaron incorrectamente, al restar valor a los duplicados y documentos del SBP, descartar la prueba documental remitida por la ACT al Senado y restar credibilidad a los testimonios por no ser periciales aun cuando respondían a conocimiento personal. Además, señalaron que el foro primario abusó de discreción al impedir que el señor Huck presentara el PUI para terminar la vista a las 4:00 p.m.

Además, plantearon que el TPI erró al concluir que no se demostró el uso de información incorrecta o falsa para obtener la exclusión categórica y el PUI. Manifestaron que el deslinde de 1998 remitido al Senado estaba incompleto y omitía páginas relativas a áreas con recursos arqueológicos. Apuntaron discrepancias en la identificación de parcelas, titulares y áreas impactadas del proyecto, ausencia de un deslinde vigente y falta de rigor en el expediente. Afirmaron que el TPI impuso una carga probatoria excesiva al exigir la intervención de un agrimensor, pese a que el deslinde no era vigente, tal exigencia no surgía de la ley, además de resultar imposible ante la falta de notificaciones y vistas públicas.

Adujeron que el TPI no armonizó la *Ley de Permisos*, *supra*, con la Orden Administrativa 2021-02, *supra*, y el *Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios*, Reglamento Núm. 9473 del 16 de junio de 2023 (Reglamento Conjunto). Por ello, indicaron que no evaluó correctamente su el proyecto cualificaba para la exclusión categórica en cuanto al límite de 15,000 pies cuadrados y las restricciones sobre la zona marítimo terrestre, áreas ecológicamente sensitivas y recursos arqueológicos. Además, cuestionaron la conclusión de que no existían determinaciones

finales impugnables bajo el Artículo 14.1 de la *Ley de Permisos, supra,* sec. 9024, cuando el PUI y la certificación de cumplimiento ambiental por exclusión categórica constituían determinaciones finales.

Por último, impugnaron la imposición de honorarios de abogados por falta de determinación de temeridad, y sostuvieron que la apreciación de la prueba y el manejo procesal del caso vulneraron su derecho al debido proceso de ley.

En su alegato suplementario, los apelantes sostuvieron que el TPI partió de una premisa errónea al descartar como irrelevante el análisis sobre los hábitats y recursos naturales. Ello, puesto que la controversia no giró en torno a infracciones ambientales aisladas, sino sobre la revocación de permisos sustentados en certificaciones de cumplimiento ambiental basadas en información falsa o incorrecta que permitieron su aprobación sin notificación ni vistas públicas. Añadieron que se invocó una exclusión categórica federal para justificar los permisos y endosos, sin que se acreditara documentalmente, y que el material aportado reflejaba que los procesos federales no habían iniciado o concluido para junio de 2025.

Reiteraron que el proyecto no cumplió con el límite de 15,000 pies cuadrados y las restricciones ambientales, puesto que su extensión podía aproximarse a 250,000 pies cuadrados. Señalaron que el único deslinde identificado era de 1998, estaba incompleto en las páginas sobre las áreas con recursos arqueológicos y no estaba vigente, lo que impedía certificar cumplimiento ambiental en 2024.

A su vez, mencionaron que evidenciaron inconsistencias entre el PUI, el SBP y la documentación suministrada por la ACT. Entre ellas, diferencias en la descripción de parcelas, titulares, áreas susceptibles a marejadas o hábitat crítico, así como la ausencia de un memorial explicativo y una Declaración de Impacto Ambiental.

En su oposición del 22 de diciembre de 2025, el DRNA sostuvo que los apelantes no cumplieron con los elementos del Artículo 14.1 de la *Ley de Permisos, supra*, sec. 9024 al no presentar prueba documental ni testifical que demostrara la emisión de un endoso con información falsa, no evidenciar el endoso cuya revocación procuraban, ni identificar su vínculo con el PUI. Adujo que el perito de los apelantes reconoció que el PUI no requería deslinde ni endosos, por tratarse de requisitos propios de permisos de construcción.

En igual fecha, la OGPe solicitó confirmar el dictamen apelado al argüir que la acción bajo el Artículo 14.1 de la *Ley de Permisos, supra*, sec. 9024, perseguía viabilizar el cumplimiento de la normativa de planificación y no reabrir controversias fuera de sus parámetros. Indicó que no se acreditaron circunstancias de fraude, dolo, engaño, conducta ilegal ni riesgos a la salud, seguridad o condiciones ambientales o arqueológicas que derrotaran la presunción de corrección y legalidad de las determinaciones finales y permisos, según reconoció el Artículo 9.10 de la *Ley de Permisos, supra*, sec. 9019i. Manifestó que los apelantes no evidenciaron el PUI, los endosos, ni identificaron con precisión la información falsa o incorrecta que se había suministrado para su otorgamiento, dado que no bastaba con demostrar meras irregularidades administrativas.

Por su parte, el 26 de diciembre de 2025, el Municipio presentó su alegato en el que solicitó confirmar la sentencia al plantear que los apelantes no probaron los elementos del Artículo 14.1 de la *Ley de Permisos, supra*, sec. 9024 ni demostraron el uso de información falsa para obtener la determinación final. Indicó que ningún testigo acreditó que el Municipio recibió información incorrecta al emitir su endoso. A su vez, adujo que el perito no tuvo acceso al expediente completo ni a la copia certificada del PUI y que no se incorporaron en evidencia el endoso municipal ni el PUI. Finalmente, defendió la

imposición de honorarios bajo el Artículo 14.1 de la *Ley de Permisos, supra,* sec. 9024, por la acción carecer de mérito.

En su oposición presentada el 29 de diciembre de 2025, la ingeniera Velázquez Delgado solicitó confirmar la *Sentencia* apelada al manifestar que no se demostró que el PUI ni los endosos se obtuvieron mediante información falsa, ni que ella sometió el PUI, fuera dueña del proyecto o incurriera en fraude. Precisó que la prueba se limitó a opiniones no cualificadas y documentos que no equivalían al expediente certificado de la OGPe. Invocó que los apelantes no rebatieron la presunción de corrección y legalidad de las determinaciones finales y permisos expedidos por la OGPe. Planteó que cualquier alegación sobre irregularidad administrativa no sustituía la carga probatoria de demostrar información falsa o incorrecta en la solicitud del permiso. Por último, defendió la imposición de honorarios al entender que la acción carecía de mérito.

En igual fecha, la ACT peticionó confirmar el dictamen apelado al exponer que los apelantes debían demostrar que el PUI o la determinación final se obtuvieron mediante información falsa o conducta ilícita. Puntualizó que la prueba presentada no demostró que se suministró información incorrecta o falsa a la OGPe, al DRNA o al Municipio. Subrayó que la ausencia del expediente administrativo impidió evaluar la base de la aprobación del permiso y que la mera alegación de irregularidades o de información incompleta ante una comisión legislativa no satisfizo el estándar del Artículo 14.1 de la *Ley de Permisos, supra,* sec. 9024.

Eventualmente, el 26 de enero de 2026, los apelantes solicitaron autorización para instar una orden de mostrar causa, al amparo del Artículo 14.1 de la *Ley de Permisos, supra,* sec. 9024, que disponía la pérdida de jurisdicción de la agencia tras la presentación del recurso extraordinario. Alegaron que la ACT continuó labores en

el proyecto, incluida la tala de árboles, por lo que interesaron que el Tribunal evaluara si la agencia actuó *ultra vires*.

El 30 de enero de 2026, la ACT manifestó que la pérdida automática de jurisdicción bajo la *Ley de Permisos, supra*, solamente procedía cuando coexistía una querella administrativa y un recurso judicial sobre los mismos hechos. Señaló que, como proponente del proyecto y no como foro administrativo, no quedaba sujeta a esa norma, y que la mera presentación de una demanda no paralizó los trabajos sin orden judicial expresa, dado que los permisos gozaron de presunción de corrección y legalidad. Añadió que cumplió con la orden de paralización, que la obra contaba con permisos válidos y que la desestimación del TPI reforzó la presunción de corrección.

## II.

### A. Apreciación de la prueba

Como foro revisor, corresponde examinar si el tribunal de instancia aplicó correctamente el derecho a los hechos. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Para cumplir con ello, es indispensable que el foro primario desarrolle un expediente completo con determinaciones de hechos sustentadas en la prueba desfilada. *Íd.* Ello responde a que el foro apelativo no celebra juicios plenarios, no observa el testimonio oral, ni dirime la credibilidad. *Íd.*

No obstante, ante prueba documental, pericial o testimonial ofrecida mediante declaración escrita, el tribunal apelativo se encuentra en igual posición que el foro de instancia. *Ortiz et al. v. SLG Meaux*, 156 DPR 488, 495 (2002). De igual modo, las conclusiones de derecho son revisables en su totalidad. *Dávila Nieves v. Meléndez Marín, supra*, pág. 770. Ahora bien, como norma general, las determinaciones de hechos y la apreciación de credibilidad realizadas por el foro primario se consideran correctas. *Íd.*, pág. 771. Por ello, la intervención apelativa en la revisión de la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos

procede únicamente cuando medie error manifiesto, pasión, prejuicio o parcialidad. *WMM, PFM et al. v. Colegio et al.*, 211 DPR 871 (2023); *Pueblo v. Hernández Doble*, 210 DPR 850, 866 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021).

### B. Desestimación por insuficiencia de la prueba

La Regla 39.2 (c) de Procedimiento Civil, *supra*, regula la moción de desestimación contra la prueba o por insuficiencia de la prueba. Mediante este mecanismo, la parte demandada puede plantear ante el TPI que, a base de la prueba presentada por la parte demandante, no existe evidencia suficiente de algún elemento esencial de la reclamación, por lo que procede la desestimación total o parcial del pleito. En lo pertinente, la regla dispone lo siguiente:

> Después que la parte demandante haya terminado la presentación de su prueba, la parte demandada, sin renunciar al derecho de ofrecer prueba en caso de que la moción sea declarada "sin lugar", podrá solicitar la desestimación fundándose en que bajo los hechos hasta ese momento probados y la ley, la parte demandante no tiene derecho a la concesión de remedio alguno. El tribunal podrá entonces determinar los hechos y dictar sentencia contra la parte demandante, o podrá negarse a dictar sentencia hasta que toda la prueba haya sido presentada. A menos que el tribunal lo disponga de otro modo en su orden de desestimación, una desestimación bajo esta Regla 39.2 y cualquier otra desestimación, excepto la que se haya dictado por falta de jurisdicción o por haber omitido acumular una parte indispensable, tienen el efecto de una adjudicación en los méritos.

Conforme a esta disposición, una vez la parte demandante concluye su prueba, la parte demandada puede solicitar la desestimación del pleito argumentando que la evidencia presentada no sustenta la concesión de un remedio bajo los hechos probados y el derecho aplicable. Ante tal solicitud, el tribunal debe evaluar la prueba presentada hasta ese momento y determinar, conforme a su apreciación de los hechos y a la credibilidad que le merezca la evidencia, si la prueba es suficiente para satisfacer los elementos de la causa de acción. *Rivera Figueroa v. The Fuller Brush Co.,* 180 DPR 894, 915-916 (2011).

Si el juzgador concluye que la parte demandante no presentó prueba suficiente para sostener sus alegaciones, procede la desestimación de la demanda. *Lebrón v. Díaz*, 166 DPR 89, 94 (2005). En cambio, si la evidencia sugiere que, bajo alguna circunstancia, la parte demandante podría prevalecer, la duda generada requiere que la parte demandada presente su caso para el tribunal tener una visión más completa de los hechos. *Colombani v. Gob. Mun. Bayamón*, 100 DPR 120, 122-123 (1971).

Este mecanismo debe ejercerse tras un escrutinio sereno y cuidadoso de la prueba. En consecuencia, la desestimación contra la prueba solo procede cuando el tribunal está plenamente convencido de que la parte demandante no tiene oportunidad de prevalecer. Dicho de otro modo, no debe desestimarse una demanda en esta etapa salvo que se desprenda con certeza que la parte demandante carece de derecho a remedio bajo cualquiera de los hechos que pudieran probarse. *SLG Sierra v. Rodríguez*, 163 DPR 738, 746 (2005); *Roselló Cruz v. García*, 116 DPR 511, 520 (1985).

### C. Proceso de permisos en Puerto Rico

La *Ley de Permisos*, *supra*, rige el proceso de evaluación y otorgamiento de permisos en Puerto Rico. Dicho estatuto se aprobó para, entre otros, establecer el marco estructural de la solicitud, evaluación, concesión y denegación de determinaciones finales, permisos, licencias, certificaciones o autorizaciones relacionadas con la operación de un negocio o el desarrollo de proyectos de construcción. Art. 1.2 de la *Ley de Permisos*, *supra*, sec. 9011.

Tal proceso está revestido del más alto interés público al incidir en el desarrollo económico, la creación de empleos y la prestación de servicios, asegurando el fiel cumplimiento con las disposiciones aplicables. *Íd.* Ello, conforme a la Sección 7 del Artículo II y Sección 19 del Artículo VI de la Constitución de Puerto Rico que reconocen, respectivamente, el derecho al disfrute de la propiedad y la política

pública de conservación de los recursos naturales. *Íd.*; Art. 1.4 de la *Ley de Permisos, supra,* sec. 9011. Asimismo, las determinaciones sobre el desarrollo y uso de terrenos, la expedición de permisos, certificaciones o documentos requeridos para realizar negocios en Puerto Rico, deben efectuarse de forma transparente, certera, confiable, uniforme y ágil, garantizando el debido proceso de ley. *Íd.*

El Artículo 8.1 de la *Ley de Permisos, supra,* sec. 9018, dispone que cualquier persona que interese solicitar permisos u otras autorizaciones relacionadas con el desarrollo y uso de terrenos lo puede realizar ante la OGPe, los municipios autónomos con jerarquía I a V o mediante un profesional autorizado, según corresponda. Entre las solicitudes que pueden presentarse se encuentran las consultas de ubicación, los permisos de segregación o lotificación, los permisos de construcción, los permisos de uso, los permisos únicos y los documentos ambientales relacionados con el desarrollo y uso de terrenos. *Íd.* Toda la documentación sometida por cualquier parte con interés legítimo en el proyecto, la agencia con jurisdicción para adjudicar la solicitud, las entidades gubernamentales concernidas, los participantes o los interventores formarán parte del expediente administrativo. Art. 8.3 de la *Ley de Permisos, supra,* sec. 9018b.

A su vez, la Ley de Permisos establece mecanismos para garantizar la participación de las personas potencialmente afectadas por una solicitud de permiso. En ese sentido, el Artículo 9.8 de la referida Ley, *supra,* sec. 9019g, dispone que, salvo en los casos de permisos ministeriales, el solicitante deberá notificar la presentación de la solicitud a los colindantes inmediatos de la propiedad donde se propone la acción. Asimismo, cuando la propiedad colinda con vías de tránsito, caminos, servidumbres, cuerpos de agua o bienes de dominio público, la notificación deberá dirigirse al propietario ubicado al otro lado de dicha vía, servidumbre o cuerpo de agua. *Íd.*

Como parte del proceso de evaluación de la solicitud, se solicitarán recomendaciones a los municipios, la JP y las entidades gubernamentales concernidas. Art. 8.4 de la *Ley de Permisos, supra*, sec. 9018c; Sec. 2.1.9.11 del Reglamento Conjunto, *supra*. Además, se incorpora la evaluación de cumplimiento ambiental, la cual constituye un procedimiento de planificación ambiental requerido para evaluar la viabilidad ambiental de una acción propuesta. Art. 8.5 de la *Ley de Permisos, supra*, sec. 9018d; R. 2.6.1 del Reglamento Conjunto, *supra*. El propósito de este proceso *sui generis* es que las instrumentalidades gubernamentales consideren los efectos ambientales de una acción propuesta antes de emitir una determinación final. R. 2.6.1 del Reglamento Conjunto, *supra*. Bajo ningún concepto podrá emitirse una determinación final sin que previamente se haya emitido la correspondiente determinación de cumplimiento ambiental, la cual únicamente será revisada en conjunto con esta. *Íd.*; R. 2.6.5 del Reglamento Conjunto, *supra;* Inciso I (5) de la Orden Administrativa 2021-02*, supra.*

La OGPe dirige el proceso de evaluación del documento ambiental a través de la División de Evaluación de Cumplimiento Ambiental (DECA), la cual emite recomendaciones que se consideran como parte de la determinación sobre la acción propuesta. *Íd.* Cuando el documento ambiental es una Evaluación Ambiental,[28] la DECA lo evalúa conforme al reglamento de documentos ambientales del DRNA y remite sus recomendaciones al Secretario Auxiliar de la OGPe, quien emite la determinación de cumplimiento ambiental. Sec. 2.6.5.2 del Reglamento Conjunto, *supra*; Art. 8.5 de la *Ley de Permisos, supra*, sec. 9018d. Cuando se trata de una Declaración de

---

[28] Evaluación Ambiental se define como el documento ambiental utilizado por la agencia proponente para determinar si la acción propuesta podría tener un impacto ambiental significativo, cuando no se ha decidido previamente presentar una Declaración de Impacto Ambiental. Art. 1.5 (35) de la *Ley de Permisos, supra*, sec. 9011; Glosario de términos del Reglamento Conjunto, *supra*.

Impacto Ambiental,[29] la DECA evalúa el documento y remite sus recomendaciones a la Junta Adjudicativa de la OGPe, la cual emite la determinación de cumplimiento ambiental. Sec. 2.6.5.3 del Reglamento Conjunto, *supra.*

Dentro del proceso de planificación ambiental se reconocen las exclusiones categóricas, las cuales se definen como acciones predecibles o rutinarias que, en el curso normal de su ejecución, no tendrán un impacto ambiental significativo. Art. 1.5 de la *Ley de Permisos, supra,* sec. 9011; Glosario de términos del Reglamento Conjunto, *supra.* Cuando la acción propuesta cualifica como una exclusión categórica, el solicitante certificará por escrito y bajo juramento que cumple con los requisitos correspondientes. Art. 8.5 de la *Ley de Permisos, supra,* sec. 9018d; Regla 2.6.6 del Reglamento Conjunto, *supra.* En tales casos, la OGPe, a través de su Secretario Auxiliar o los profesionales autorizados, podrá emitir una Determinación de Cumplimiento Ambiental por Exclusión Categórica,[30] de forma automática, la cual formará parte del expediente administrativo y constituirá un componente de la determinación final sobre la acción propuesta. *Íd.*

El 28 de enero de 2021, el DRNA aprobó la Orden Administrativa 2021-02 (derogada) para establecer el listado de

---

[29] Una Declaración de Impacto Ambiental es un documento ambiental presentado ante la OGPe, el cual será referido a la DECA para cumplir con los requisitos de la *Ley sobre Política Pública Ambiental,* Ley Núm. 416-2004, según enmendada, 12 LPRA sec. 8001a, cuando se haya determinado que la acción propuesta podría conllevar un impacto significativo sobre el ambiente. Art. 1.5 (19) de la *Ley de Permisos, supra,* sec. 9011; Glosario de términos del Reglamento Conjunto, *supra.*

[30] Una Determinación de Cumplimiento Ambiental por Exclusión Categórica se define como una:

> determinación que realiza el Profesional Autorizado, o el Director de la Oficina de Gerencia de Permisos, como parte de una determinación final, en donde certifica que la acción, actividad o proyecto propuesto no requiere acción ulterior de planificación ambiental por estar clasificado como una Exclusión Categórica. Se considerarán Exclusiones Categóricas todas aquellas acciones que así determine la Junta de Calidad Ambiental mediante reglamento, orden o resolución promulgada a esos efectos. Como parte de la solicitud de Determinación de Cumplimiento Ambiental bajo Exclusión Categórica, el solicitante del permiso certifica por escrito, bajo juramento, y sujeto a las penalidades impuestas por esta Ley y cualesquiera otras leyes estatales o federales, que la información contenida en la solicitud es veraz, correcta y completa y que la acción propuesta cualifica como una Exclusión Categórica. Art. 1.5 (23) de la *Ley de Permisos, supra,* sec. 9011.

exclusiones categóricas. Dicho documento establecía que la solicitud de exclusión categórica debe fundamentar, mediante memorial explicativo, las razones de aplicabilidad para cada acción solicitada, y evidenciar con fotos, cálculos y/o documentos de cumplimiento con los requisitos. *Íd.*, inciso I(6). Además, si la determinación de cumplimiento ambiental por exclusión categórica se obtuvo mediante la presentación de una solicitud con información falsa, errónea, incompleta o en incumplimiento con los requisitos[31], puede conllevar la revocación de la determinación final o dejarla sin efecto.

---

[31] Algunas de las restricciones para que la acción u obra pudieran obtener una Determinación de Cumplimiento Ambiental por Exclusión Categórica son las siguientes:

[…]

1. No descargará contaminantes a cuerpos de agua que requieran la aplicación de un nuevo permiso federal de descarga bajo el programa conocido como el *National Permit Discharge Elimination System* (NPDES), o de una modificación al existente ni generará desperdicios peligrosos. […]

2. No se fragmentará o segmentará la acción propuesta en diferentes etapas con el fin de evadir los requerimientos de un documento ambiental.

[…]

5. No se realizará actividad alguna dentro de un cuerpo de agua, a menos que sea una obra de dragado[,] de mantenimiento, mitigación, investigación, medición, monitoreo o remediación ambiental.

7. La acción propuesta ubica en un área donde no existen problemas de infraestructura relacionada con los servicios de energía eléctrica, agua potable, alcantarillado sanitario, alcantarillado pluvial y la capacidad vial para los accesos.

8. La acción propuesta deberá cumplir con cada uno de los requisitos específicos que le son de aplicabilidad.

[…]

a) Toda construcción nueva no podrá ser desarrollada o estar ubicada en:

1. Áreas especiales con riesgo de inundación, derrumbes o marejadas, incluyendo la zona marítimo terrestre y su servidumbre de salvamento;

ii. Áreas designadas como "Superfund Site", y/o donde el Departamento de Recursos Naturales y Ambientales u otras agencias gubernamentales estatales o federales hayan determinado que existe un grado de contaminación que excede el permitido por los reglamentos vigentes, con excepción de las áreas designadas a través del programa federal de "Brownfields";

iii. Áreas ecológicamente sensitivas o protegidas oficialmente designadas por el Departamento de Recursos Naturales y Ambientales, la Junta de Planificación o cualquier agencia estatal o federal con jurisdicción;

iv. Áreas donde existan especies únicas de fauna o flora que estén en peligro de extinción;

v. Áreas que puedan afectar ecológicamente sistemas naturales o artificiales ya sea en forma directa o indirecta;

vi. Áreas que no cuenten con infraestructura para el suministro de agua potable, disposición de las aguas sanitarias, energía eléctrica o capacidad vial para el manejo adecuado del tránsito de vehículos de motor. Se dispensa de este requisito a las residencia unifamiliares y proyectos agrícolas en áreas rurales, en donde la infraestructura o servicios de esta naturaleza son limitados.

vii. Áreas que constituyan yacimientos minerales, conocidos o potenciales;

viii. Áreas donde existen yacimientos arqueológicos o de valor cultural, según determinado por el Instituto de Cultura Puertorriqueña, Registro Nacional de Lugares Históricos, y/o la Oficina Estatal de Conservación Histórica, según aplique;

ix. Áreas de topografía escarpada en cuencas hidrográficas donde se puedan afectar fuentes de abasto de agua potable.

b) No excede de quince mil pies cuadrados (15,000 p$^2$) en la suma total de ambas áreas (ocupación y área bruta de piso), incluyendo la infraestructura asociada.

Entre las acciones que se puede solicitar como exclusión categórica, siempre que cumplan con las restricciones aplicables a cada caso, se encuentran aquellas declaradas como tales mediante leyes especiales, reglamentos u órdenes ejecutivas, así como proyectos aprobados como exclusiones categóricas por agencias federales, entre otros.

En cuanto al uso y desarrollo de terrenos y cuerpos de aguas en la zona costanera de Puerto Rico, sus costas y plazas, la Sección 6.4.2.2 del Reglamento Conjunto, *supra*, establece que en todo proyecto de lotificación, urbanización o desarrollo de terrenos, así como la construcción, alteración, ampliación o uso de estructuras o edificios en terrenos colindantes con el litoral, se debe someter un plano de deslinde de la zona marítimo terrestre certificado por el DRNA. Dicho plano tiene una vigencia de cinco (5) años. No obstante, cuando por causas naturales o por alteraciones de origen humano se producen cambios en la costa, se puede requerir un nuevo deslinde antes de transcurrir dicho término. *Íd.* Dicha certificación no concede derechos de propiedad permanentes, ya que únicamente representaba el límite de la zona marítimo terrestre a la fecha en que se prepara el plano. *Íd.*

Una vez examinada la información, la autoridad competente procede a emitir la determinación final, la cual se define como toda:

> Actuación, resolución, informe o documento que contiene un acuerdo o decisión emitida por la Junta de Planificación, el Director Ejecutivo, el Juez Administrativo, los Municipios Autónomos con Jerarquía de la I a la V o un Profesional Autorizado, o una Entidad Gubernamental Concernida, adjudicando de manera definitiva algún asunto ante su consideración o cualquier otra determinación similar o análoga que se establezca en el Reglamento Conjunto. La determinación se convertirá en final y firme una vez hayan transcurrido los términos correspondientes para revisión. En el caso de las consultas de ubicación, una determinación final no constituye la otorgación de un permiso. Art. 1.5 de la *Ley de Permisos, supra,* sec. 9011; Inciso (D)(40) del Glosario de términos del Reglamento Conjunto, *supra.*

---

c) Las aguas de proceso y de lavado que sean generadas en la construcción y operación deberán ser dispuestas a través de un sistema de alcantarillado sanitario; [...]

De igual forma, la concesión o denegación de una solicitud discrecional constituye una determinación final. Arts. 8.7 y 8.8A de la *Ley de Permisos, supra*, secs. 9018f y 9018g.

A esos efectos, el Artículo 9.10 de la *Ley de Permisos, supra*, sec. 9019i, dispone que se presume la corrección y legalidad de las determinaciones finales y de los permisos expedidos por la OGPe, los municipios autónomos con jerarquía I a V y los profesionales autorizados. No obstante, dicha presunción se puede derrotar cuando medie fraude, dolo, engaño, extorsión, soborno o la comisión de algún otro delito en el otorgamiento o denegación del permiso, o cuando la estructura represente un riesgo a la salud, la seguridad o a condiciones ambientales o arqueológicas. *Íd.* En tales circunstancias, la determinación final o el permiso podrá ser revocado por el foro administrativo o judicial competente. *Íd.* Ahora bien, una determinación final no será suspendida sin mediar una autorización o mandato judicial. *Íd.*

**C. Recurso extraordinario para la revocación de permiso, paralización de obra o uso no autorizado y demolición de obra**

La *Ley de Permisos, supra*, establece mecanismos para exigir el cumplimiento de las disposiciones del sistema de permisos y atender controversias relacionadas con el desarrollo y uso de terrenos. En ese contexto, el Artículo 14.1 de la *Ley de Permisos, supra*, sec. 9024, dispone el procedimiento aplicable para solicitar la revocación de permisos, paralización de obras o usos no autorizados o demolición de obras. A saber:

> La Junta de Planificación, un Municipio Autónomo con Jerarquía de la I a la III, una Entidad Gubernamental Concernida que haya determinado que sus leyes y reglamentos han sido violados, o cualquier persona privada, natural o jurídica, que tenga un interés propietario o personal que podría verse adversamente afectado, podrá presentar una acción de *injunction, mandamus*, sentencia declaratoria, o cualquier otra acción adecuada para solicitar:
> 1) la revocación de una determinación final otorgada, cuya solicitud se haya hecho utilizando información incorrecta o falsa;

2) la paralización de una obra iniciada sin contar con las autorizaciones y permisos correspondientes, o incumpliendo con las disposiciones y condiciones del permiso otorgado;

3) la paralización de un uso no autorizado o de una construcción autorizada mediante permiso, para la cual no se hayan realizado los pagos correspondientes a aranceles, pólizas, arbitrios y sellos;

4) la demolición de obras construidas, que al momento de la presentación del recurso y al momento de adjudicar el mismo no cuenten con permiso de construcción, ya sea porque nunca se obtuvo o porque el mismo ha sido revocado.

En los casos en los que se solicite la revocación de una determinación final, será parte indispensable de en el pleito la entidad o profesional autorizado que haya emitido la determinación final y el dueño del proyecto. Además, en los casos en los que se solicite la revocación de un permiso otorgado por haberse utilizado información incorrecta o falsa y que dicho permiso se haya expedido bajo las disposiciones de la Ley Núm. 135 de 15 de junio de 1967, según enmendada, dicho ingeniero o arquitecto también será parte indispensable en el pleito.

Indistintamente de haberse presentado una querella administrativa ante la Junta de Planificación, Entidad Gubernamental Concernida, Municipio Autónomo con Jerarquía de la I a la V o cualquier otra dependencia o instrumentalidad del Gobierno de Puerto Rico, alegando los mismos hechos, una parte adversamente afectada podrá presentar un recurso extraordinario en el Tribunal de Primera Instancia. Una vez habiéndose presentado el recurso extraordinario al amparo del presente Artículo, la agencia administrativa perderá jurisdicción automáticamente sobre la querella y cualquier actuación que llevare a cabo con respecto a la misma será considerada *ultra vires*.

El Tribunal de Primera Instancia deberá celebrar vista dentro de un término no mayor de diez (10) días naturales desde la presentación del recurso y deberá dictar sentencia en un término no mayor de veinte (20) días naturales desde la celebración de la vista.

En aquellos casos en los cuales se solicite la paralización de una obra o uso, de ser la misma ordenada por el Tribunal, se circunscribirá única y exclusivamente a aquellos permisos, obras o uso impugnado, mas no a ningún otro que se lleve a cabo en la propiedad y que cuente con un permiso o autorización debidamente expedida.

El Tribunal impondrá honorarios de abogados contra la parte que presenta el recurso bajo este Artículo si su petición resulta carente de mérito y razonabilidad o se presenta con el fin de paralizar una obra o permiso sin fundamento en ley. Los honorarios de abogados bajo este Artículo será una suma igual a los honorarios que las otras partes asumieron para oponerse a la petición judicial. En el caso que el Tribunal entienda que no es aplicable la presente imposición de honorarios de abogados, tendrá que así explicarlo en su dictamen con los fundamentos para ello. Las revisiones de los dictámenes bajo este Artículo ante el Tribunal de Apelaciones se remitirán a los paneles especializados creados mediante esta Ley y dicho foro tendrá 60 días para resolver el recurso de revisión desde la presentación del mismo.

**III.**

En el presente caso, los apelantes sostuvieron, entre otros, que el TPI desestimó la *Demanda* al concluir que no presentaron prueba suficiente para sostener su reclamación bajo el Artículo 14.1 de la

*Ley de Permisos, supra,* sec. 9024. No obstante, un examen cuidadoso del expediente ante nuestra consideración devela que el foro primario erró en su proceder al existir varias circunstancias que, evaluadas en conjunto, levantaban controversias sustanciales de hecho y derecho sobre la corrección del proceso mediante el cual se emitió el PUI impugnado.

Según surgió del propio permiso en controversia, el proyecto autorizado corresponde a la denominada Ruta Escénica para Ciclistas y Peatones. El PUI identificó que el tipo de obra a realizar corresponde a una construcción, con un área total de 12,410.0000 metros cuadrados. A su vez, describió varios componentes asociados a la obra, incluyendo el movimiento de aproximadamente 11,837.0000 metros cúbicos de material de la corteza terrestre, el relleno de aproximadamente 15,964.0000 metros cúbicos, el corte de 179 árboles con un plan de mitigación de 368 árboles, así como la generación de aproximadamente 1,077.0000 yardas cúbicas de desperdicios de construcción. Esta descripción contenida en el propio documento administrativo resultó relevante al evaluar la naturaleza y la magnitud de las actividades autorizadas mediante el permiso impugnado.

El expediente reflejó que el proyecto se tramitó mediante el mecanismo de Determinación de Cumplimiento Ambiental por Exclusión Categórica. Conforme el derecho aplicable, dicho mecanismo se reserva para acciones rutinarias o predecibles que, en el curso normal de su ejecución, no conllevan impactos ambientales significativos. Entre las restricciones aplicables a este mecanismo se encuentran, entre otras, que la construcción propuesta no exceda de 15,000 pies cuadrados en su área total de ocupación y piso, que la acción no se ubique en áreas ambientalmente sensitivas o protegidas y que no implique descargas contaminantes a cuerpos de agua que requieran permisos federales adicionales bajo el programa NPDES.

El área total del proyecto indicada en el PUI —12,410.0000 metros cuadrados, equivalente aproximadamente a 133,580.13 pies cuadrados— supera significativamente el parámetro de 15,000 pies cuadrados que se utiliza como referencia reglamentaria para las acciones de construcción nueva, según dispuesto en la Orden Administrativa 2021-02 del DRNA, *supra*.

Asimismo, del propio permiso surge que los cuerpos de agua receptores de las escorrentías generadas por el proyecto son la Playa Domes, la Playa María, la Reserva Marina Tres Palmas y el Balneario de Rincón. La presencia de escorrentías hacia cuerpos de agua costeros constituye un factor ambiental relevante dentro del análisis reglamentario de cumplimiento ambiental, particularmente cuando se trata de determinar la aplicabilidad de un mecanismo diseñado para acciones que no conllevan impactos ambientales significativos.

A ello se suma la prueba presentada durante la vista relacionada con el deslinde de la zona marítimo terrestre utilizado para evaluar el proyecto. El señor Cardona Roig declaró que el único deslinde que pudo identificar en los documentos examinados correspondía al año 1998, mientras que la representante legal del DRNA indicó al TPI que el endoso de la agencia se evaluó utilizando un deslinde del año 2007. Independientemente de cuál de estos documentos se utilizó finalmente en el proceso administrativo, la evidencia presentada era suficiente para plantear una controversia razonable sobre si la información utilizada para evaluar el proyecto reflejaba adecuadamente las condiciones actuales del litoral al momento de tramitarse el permiso en el año 2024.

Este aspecto reviste particular importancia cuando se considera que el Reglamento Conjunto, *supra*, establece que, para proyectos de desarrollo ubicados en terrenos colindantes con el litoral, se debe someter un plano de deslinde de la zona marítimo terrestre certificado por el DRNA, con una vigencia de cinco (5) años,

el cual se puede requerir actualización cuando ocurran cambios significativos en la costa. La prueba presentada durante la vista sugirió que la zona costera de Rincón ha experimentado procesos de erosión y cambios geomorfológicos asociados a fenómenos naturales, circunstancias que justificaban examinar con mayor detenimiento la vigencia y confiabilidad del deslinde utilizado. En ese contexto, la utilización de un deslinde cuya fecha antecede por más de una década la solicitud del permiso impugnado levantaba interrogantes razonables sobre si la información utilizada para evaluar el proyecto reflejaba adecuadamente las condiciones actuales del litoral.

Finalmente, la prueba también demostró que los apelantes —quienes son propietarios y residentes en el área impactada por el proyecto— no recibieron notificación previa de la solicitud del permiso. El Artículo 9.8 de la *Ley de Permisos*, *supra*, sec. 9019g, establece que, salvo en los permisos ministeriales, el solicitante debe notificar a los colindantes inmediatos del área donde se propone la acción. La ausencia de dicha notificación privó a los apelantes de la oportunidad de participar oportunamente en el proceso administrativo y de presentar objeciones o información relevante antes de la emisión del PUI. Asimismo, incide sobre la corrección del proceso administrativo mediante el cual se emitió la determinación final impugnada.

Consideradas en conjunto, estas circunstancias —incluyendo la magnitud del proyecto reflejada en el propio permiso, la utilización del mecanismo de exclusión categórica, la descarga de escorrentías hacia aguas costeras, la utilización de un deslinde antiguo y la alegada ausencia de notificación a colindantes— eran suficientes para levantar una controversia sustancial sobre si la determinación final impugnada se emitió conforme a los requisitos legales aplicables. Por consiguiente, el TPI erró al desestimar la *Demanda* al establecer, mediante la Regla 39.2(c) de Procedimiento Civil, *supra*,

que la prueba presentada por los apelantes era insuficiente para sostener una reclamación al amparo del Artículo 14.1 de la *Ley de Permisos*, *supra*, sec. 9024. La prueba desfilada durante la vista era suficiente para levantar controversias sustanciales de hecho y derecho que ameritaban la continuación del procedimiento judicial.

En consecuencia, se revoca la determinación apelada. En vista de la anterior conclusión, procede también la revocación de la imposición de honorarios efectuada por el TPI.

**IV.**

Por los fundamentos antes expuestos, se revoca la determinación apelada, y se devuelve el caso para la continuación de los mismos ante el foro primario. Dicho foro tendrá autoridad plena determinar sobre la paralización decretada mediante nuestra Resolución de 12 de noviembre de 2025.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones